Filed 1/16/26  P. v. Medina CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LUIS ENRIQUE MEDINA,<br><br>    Defendant and Appellant. | B338781<br><br>(Los Angeles County<br>Super. Ct. No. LA099932) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Martin Herscovitz, Judge.  Affirmed.

Brad J. Poore for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jonathan J. Kline and Melanie Dorian, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Luis Medina of inflicting corporal injury on his girlfriend, Emma R., with a prior conviction for inflicting corporal injury on a domestic partner within seven years of the current offense. He makes three contentions on appeal. First, the trial court misinstructed the jury that his prior conviction for domestic violence by itself proved the current offense. Second, the trial court abused its discretion by denying his mistrial motion after the jury heard inadmissible hearsay about his threat to kill Emma. And third, the trial court improperly used the same aggravating factor to impose the upper term on the substantive offense and on an enhancement. We reject all contentions and affirm the judgment.

## BACKGROUND

I. Evidence at trial

One evening in September 2021, Emma was stabbed multiple times. The evidence at trial showed that around the time Emma was stabbed, her roommate and neighbors saw Medina or heard his car leaving the scene, although Medina denied stabbing Emma.

A. *Prosecution's case-in-chief*

In September 2021, Jordan Rippe, Rachel Rukseta, and Emma lived at a house in North Hollywood. Rippe's family owned the house, and he used one bedroom and Rukseta used the second bedroom. Emma lived in a detached shed that had been converted into a bedroom at the back of the property.

Emma had been dating Medina since spring 2021, and he was at the property often. Medina drove a gray Cadillac that had a distinct sound. The car was so loud that Rukseta could hear

2

Medina coming and going in his car, and neighbors had complained about the noise.

Rukseta heard Medina arguing with Emma "a lot." He cussed at Emma and called her a "bitch." Rukseta thought that Medina was drunk when he fought with Emma because a couple of times glass bottles were thrown outside Rukseta's window. Sometimes Emma would talk to Rukseta about the fights and refer to Medina as " '[t]hat fool' " or "[t]his fool.' "

On September 1, 2021, Rippe was not home. Rukseta went out but returned to the house between noon and 3:00 p.m. When Rukseta returned home, she could hear Medina and Emma arguing. Medina was "angry and hostile." Rukseta heard glass shatter, and Rukseta turned up her music to drown out the sound. Emma came to Rukseta's room and told her, " 'Luis is dead.' " When Rukseta asked if she meant Medina was dead to her (Emma) or to the world, Emma replied, " 'Both. I mean, he left, if he comes back do what you need to do,' " which Rukseta interpreted as directing her to call the police. Emma also said that Medina had broken her stuff and a glass bottle and left.

About 25 minutes to an hour later, Rukseta thought she heard Emma say, " 'He's back.' " Rukseta heard Emma scream and someone running in the house, and then Emma burst into Rukseta's room. Emma was bleeding from her head, she had puncture wounds, and she said, " 'This fool stabbed me. He's going toss [sic] kill me.' " Not knowing if anyone else was in the house, Rukseta told Emma to shut the door, but Emma said, " 'He stabbed me in the fucken head.' " Rukseta heard Medina's car leaving. Paramedics arrived at 6:19 p.m. and transported Emma to the hospital.

3

Stephen and Jocelyn Fine[1] lived next door to Rippe's house. Around Spring of 2021, they saw Medina coming to Rippe's house to see Emma almost daily. They could sometimes hear Medina and Emma arguing, and Stephen said it was "often enough to know that this was a pattern." Twice, Medina and Emma argued so heatedly that Jocelyn wondered if they should call the police. Stephen further testified that Medina's Cadillac had a high powered engine that he would run for long periods of time when he came and went and while he was working on the car. Based on the sound Medina's car made, Stephen said he could be blindfolded and tell when Medina was coming and going. Jocelyn once asked Medina to turn off his car because it was noisy and spewing exhaust. Concerned about the problems they had with Medina and his car, the Fines took a photograph of it and later gave it to the police.

On the day Emma was stabbed, Stephen saw Medina three times. Stephen first saw Medina exiting the gate alongside Rippe's house just after 7:00 a.m. Stephen next saw Medina between 3:00 and 4:00 p.m. walking down the driveway. Then, around 6:00 p.m., Stephen was in his garden when he heard Emma's "shed door blowing open," as if somebody thrust their body against it trying to get out, and Emma screaming and saying in a shocked tone, "No, No, No." Stephen called out to ask if Emma was ok but got no response. He and Jocelyn went outside to the front of their house and saw Medina walking from the driveway to the sidewalk to his car, get in, and leave immediately. The Fines both heard the high powered engine fire up. Jocelyn said that the man she saw wore a white short-

---

[1] We refer to some witnesses by their first names to avoid confusion.

4

sleeved T-shirt. She recognized a sound made on their home surveillance system on the day Emma was stabbed as Medina's car.

James and Denise Bosch lived across the street from the Rippe property. Although James did not know Medina, James knew that someone who owned a Cadillac would come and go from the Rippe house. James was familiar with the car because it was really loud, and a man would work on it in the middle of the night. Having worked in the muffler business, James thought that the car was either missing the muffler or the catalytic converter had been removed. On the day Emma was stabbed, James heard the car in the morning and in the evening, around 6:00 p.m.

James gave law enforcement his home surveillance footage. While reviewing that footage at trial, James identified a sound made at about 5:06 p.m. as Medina's Cadillac accelerating away. James identified a sound made at 5:28 p.m. as the Cadillac idling. The video showed a Cadillac on the street at 5:33 p.m. James recognized a sound made at 6:14 p.m. as the Cadillac. A still from the video at timestamp 6:14 p.m. showed a dark car parked across from the Bosches' house. In the investigating officer's opinion, that dark car was Medina's Cadillac.

Denise saw Medina at the Rippe property frequently. She too was familiar with a loud Cadillac that came to the Rippe property, and she identified the sound on the video at timestamp 6:13 p.m. as the sound the Cadillac made.

Andrea von Foerster also lived across the street from the Rippe property. She saw Medina coming and going from the property and working on cars on the street.[2] Medina would rev

---

[2]     Van Foerster could not identify Medina at trial.

the engine for a long time at night and sometimes during the day. Von Foerster often heard Emma and her boyfriend arguing. As the video from the day of the stabbing was played, von Foerster recognized the sound of Medina's car being revved. On the day Emma was stabbed, von Foerster heard the same car noise going north toward Collins Street. Von Forester gave law enforcement her home surveillance footage. Her footage at timestamp 6:13 p.m. showed a dark car. A person she recognized as the man who was dating Emma came from the Rippe property and got into a car that was parked where Emma's boyfriend usually parked.

Emma had been stabbed seven times in the back and once in the temple area of her head. She spent over a month in the hospital, and, at the time of trial, was unable to walk. After Emma was released from the hospital, the investigating detective spoke to her on November 29, 2021, but Emma was unable to provide any information about what happened to her. However, Emma contacted the detective in June 2022 because her memory was returning.

Emma testified at trial that when she first spoke to the investigating detective in November 2021, she did not remember anything, but her memory came back to her slowly. Emma testified that Medina stayed with her regularly. He drove a Cadillac that "had a loud smog thing." They used to argue, and he would curse at her, although he never threatened her. On September 1, 2021, she was with a friend named Edwin.[3] Medina came over, and Emma asked Edwin to leave because Medina was

---

[3] When Emma talked to the investigating detective in June 2022 she initially said her friend Joe had visited her that day but later corrected herself and said it was Edwin.

disrespecting her in front of him, saying he would kill Edwin. Edwin left, and Medina then stabbed Emma. She thought he was punching her until he stabbed her temple. Emma said that Medina came to the house only once that day, when he stabbed her.

When Medina was arrested on September 7, 2021, he had a folding knife in his waistband. His Cadillac was searched. Blood and Emma's DNA were on a white sweatshirt found in Medina's car. The knife tested negative for blood.

The parties entered three stipulations regarding Medina's prior incidents of domestic violence. On February 14, 2013, Medina was convicted of corporal injury to a spouse or cohabitant under Penal Code[4] section 273.5, subdivision (a), in case No. 2SR03528 for conduct committed on July 27, 2012. Second, on February 14, 2013, Medina was convicted of corporal injury to a spouse or cohabitant under section 273.5, subdivision (a), in case No. PA075050 for conduct committed on October 6, 2012. And third, on June 21, 2018, Medina was convicted of corporal injury to a spouse or cohabitant with a prior conviction of domestic violence within the last seven years under section 273.5, subdivision (a), in case No. PA091081 for conduct committed on March 23, 2018.

B.   *Defense case*

In his defense, Medina introduced the testimony of a memory expert and an audio/visual forensic expert.

First, Dr. Iris Blandon Gitlin testified for the defense as a memory expert. She described memory, including auditory

---

[4]    All further undesignated statutory references are to the Penal Code.

memory, as a process of construction and reconstruction. Memory is a process of construction in that we capture information and manipulate it. Factors that can impact the reliability of eyewitness memory include stereotyping or bias (both negative and positive), expectations, fast exposure time (how long a witness has to view the event or a face), the witness's distance from the event, vision impairment, lighting, and divided attention.

Dr. Gitlin explained that after memory is created, the next stage is retrieval. Factors that impact retrieval include a cowitness's influence, whether witnesses were separated when giving their accounts of an event, and the witness's age (children and adults older than 65 are less accurate). False memory occurs when a person is exposed to information from other sources and reconstructs or reframes their experience differently. People can create events they do not remember based on somebody else's suggestion.

Dr. Gitlin stated that scientific research does not support that memories can be recovered. Brain injury can impede the consolidation process, which is the ability to process and create memory.

She further said that most research about the accuracy of auditory memory focuses on voice recognition. The accuracy for voice recognition is bad, worse than for facial recognition.

The second expert, Thomas Guzman-Sanchez, was an audio/video forensic analyst who reviewed photographs of Medina's Cadillac and the home surveillance footage. He found that the sound of a car recorded at 5:07 p.m. and the sound of a car recorded at 6:14 p.m. could be from the same car. Guzman-Sanchez compared an image of a car taken at 5:07 p.m. to

Medina's car, and, in his opinion, they were different cars. Also, the car that drove away at 6:14 p.m. had no notable taillights, whereas Medina's car had pronounced rear taillights.

Guzman-Sanchez also analyzed the 6:14 p.m. footage and opined that the individual in it wore a large white or bright light colored, short sleeved T-shirt, dark baggy shorts, and high white socks.

### C. *Rebuttal*

After Medina was arrested on September 7, 2021, he gave a statement to detectives. He said that he and Emma had broken up on August 31, 2021. But he was at Emma's room on September 1 because he planned to attend an anger management class over Zoom at 6:00 p.m., and the Zoom link had been sent to Emma's phone. However, he passed out after drinking vodka, and he missed his class. Emma woke him at 8:00 p.m., and he left. Medina returned, but the gates were closed. He "jumped the back," looked for Emma, and left when he could not find her. Medina thought Emma put something in his drink.

However, Medina then said that Emma and Rukseta would not let him in the house when he came over on September 1, 2021, so he left. When he left, Emma was not screaming. Medina denied stabbing Emma and did not remember stabbing anyone.

## II. Verdict and sentence

A jury acquitted Medina of attempted murder but convicted him of inflicting corporal injury to Emma resulting in a traumatic condition (§ 273.5). The jury also found true allegations that Medina inflicted great bodily injury on Emma during the commission of the crime (§ 12022.7) and that the great bodily

9

injury was inflicted under circumstances involving domestic violence.

At a court trial, the trial court found that Medina had a prior strike conviction for section 273.5, subdivision (f)(1). The trial court also found true five aggravating circumstances: the crime involved great bodily harm or other acts disclosing a high degree of cruelty, viciousness, or callousness (Cal. Rules of Court, rule 4.421(a)(1)),[5] he used a weapon (Rule 4.421(a)(2)), he engaged in violent conduct that indicated a serious danger to society (Rule 4.421(b)(1)), he performed unsatisfactorily while on probation (Rule at 4.421(b)(5)), and he served a prior prison term (Rule 4.421(b)(3)).

On May 13, 2024, the trial court sentenced Medina to the upper term of five years doubled to 10 years based on the prior strike conviction and the upper term of five years for the great bodily injury allegation.

## DISCUSSION

I.    Instructional error

Without objection from any party, the trial court instructed the jury with a modified version of CALCRIM No. 852A regarding evidence of Medina's prior acts of domestic violence. Medina now contends that the instruction misinformed the jury that it could find him guilty of count 2 if it found he had a prior conviction of domestic violence. As such, the instruction was an incorrect statement of law and lowered the prosecution's burden of proof. We disagree.

---

[5]    All further undesignated rules are to the California Rules of Court.

10

Criminal defendants have the right to "a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." (*United States v. Gaudin* (1995) 515 U.S. 506, 510.) Thus, a "trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offense." (*People v. Merritt* (2017) 2 Cal.5th 819, 824.) A court's failure to instruct on the elements of an offense or any misinstruction that relieves the jury of its burden to find the defendant guilty of every element beyond a reasonable doubt violates a defendant's due process rights. (*People v. Hendrix* (2022) 13 Cal.5th 933, 942.)

We review a claim of instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) We assess whether the instruction accurately states the law, consider whether there is a reasonable likelihood the instruction caused the jury to misapply the law in violation of the Constitution, and view the challenged instruction " 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*Ibid.*)

Incorrect, ambiguous, or conflicting instructions that do not amount to federal constitutional error are harmless unless it is reasonably probable the outcome would have been different in the absence of the error, under the standard of review in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Hendrix, supra*, 13 Cal.5th at p. 942.) But violations of the federal constitution are evaluated under the standard in *Chapman v. California* (1967) 386 U.S. 18, which requires reversal unless the error is harmless beyond a reasonable doubt. (*Hendrix*, at p. 942.)

11

Here, the trial court instructed the jury with CALCRIM No. 852A, which concerns evidence admitted under Evidence Code section 1109. That section provides, with exceptions not applicable here, that in a criminal action where the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Evidence Code section 1101 if the evidence is not inadmissible pursuant to Evidence Code section 352. (Evid. Code, § 1109, subd. (a).) CALCRIM No. 852A instructs on the use and limited purpose of uncharged acts of domestic violence admitted under Evidence Code section 1109.

The trial court instructed the jury with a modified version of CALCRIM No. 852A by adding the italicized paragraph to the standard instruction:

> The People presented evidence that the defendant committed domestic violence that was not charged in this case.
>
> Domestic violence means abuse committed against an adult who is a cohabitant, person with whom the defendant has had a child, or a person who dated the defendant.
>
> Abuse means intentionally or recklessly causing or attempting to cause bodily injury or placing another person in reasonable fear of imminent serious bodily injury to himself or herself or to someone else. [¶] . . . [¶]
>
> *The conviction of a person for domestic violence may prove the commission of an offense for domestic violence. Violation of Section 273.5 . . . is the inflicting an injury on someone that resulted in a traumatic condition when the relationship to the*

12

*defendant was the offender's spouse or former spouse, cohabitant or former cohabitant, fiancé or former fiancé or someone who had an engagement or dating relationship.*[6]

You are not to use the evidence of a prior conviction for domestic violence for any other purpose.

You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

If the People have not met this burden of proof, you must disregard this evidence entirely.

If you decide that the defendant committed the uncharged domestic violence, you may, but are not

---

[6]     The Attorney General suggests that the trial court added this paragraph in response to the parties' concerns about what evidence would be admitted to prove the prior uncharged acts. The parties and trial court had multiple discussions about what Evidence Code section 1109 evidence would be admitted, with the prosecutor arguing that she should be permitted to introduce, for example, the testimony of officers who saw the prior victim's injuries and a 911 call. The trial court, however, limited the prosecution to admitting the fact of the prior convictions, as stated in the stipulation. Why the trial court modified CALCRIM No. 852A is not relevant to our discussion.

13

required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit the charged crimes here. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charged crimes. The People must still prove each charge beyond a reasonable doubt. (Italics added.)

As an initial matter, the Attorney General asserts that Medina forfeited his claim that the instruction contains a misstatement of law because he did not object to the instruction at trial. A failure to object, however, does not prevent a defendant from challenging an instruction on appeal to the extent the asserted error affected the defendant's substantial rights. (*People v. Ramirez* (2021) 10 Cal.5th 983, 1000; § 1259.) Assuming the claim was preserved, we conclude that it fails on its merits.

On the merits, the modification did not affect Medina's substantial rights when we review CALCRIM No. 852A's language, place CALCRIM No. 852A in the context of the instructions as a whole, and review the prosecutor's closing argument.

First, the modification is clearly about the uncharged domestic violence when read in the context of CALCRIM No. 852A itself. The instruction begins by telling the jury what it is about: "evidence that the defendant committed domestic violence that was *not charged* in this case." (Italics added.) The instruction thus states that its focus is the uncharged conduct.

14

In that context, the added language—"The conviction of a person for domestic violence may prove the commission of an offense for domestic violence"—means that a conviction is evidence of prior uncharged conduct. That is a correct statement of law: prior domestic violence offenses may be proved through certified court documents instead of, for example, live testimony. (*People v. Robinson* (2024) 99 Cal.App.5th 1345, 1353–1354; *People v. Duran* (2002) 97 Cal.App.4th 1448, 1461.)

Although the added language also could be interpreted in isolation to mean that a prior conviction "may prove" or is sufficient to prove that the defendant committed domestic violence, past or current, the remainder of CALCRIM No. 825A makes clear that a conviction may prove only prior, uncharged conduct. The instruction goes on to say that the People have to prove the uncharged conduct by a preponderance of the evidence, which is not the beyond a reasonable doubt standard required to prove the charged conduct. CALCRIM No. 852A then states that if the jury decided Medina committed the "uncharged domestic violence," the jury "may" but was not required to conclude he was disposed to commit domestic violence, and, "based on that decision, also conclude that the defendant was likely to commit and did commit the charged crimes here." However, a conclusion that Medina committed the uncharged domestic violence was "only one factor to consider along with all the other evidence" and was not sufficient by itself to prove Medina guilty of the charged crimes. (CALCRIM No. 852A.) The instruction thus concluded by unambiguously stating that a conviction of prior domestic violence was *not*, by itself, sufficient to prove Medina committed the charged crimes. Stated otherwise, a prior conviction by itself *may not prove* the charged crimes.

15

Second, reading CALCRIM No. 852A in the context of the instructions as a whole also compels this conclusion. The jury was instructed that it had to find defendant guilty of the charged crimes beyond a reasonable doubt rather than by a preponderance of the evidence. (CALCRIM No. 220.) The trial court further instructed the jury on the substantive offense of inflicting injury on a cohabitant. (CALCRIM No. 840.) CALCRIM No. 840 instructed that to find Medina guilty of that crime, the People had to prove (1) he willfully inflicted physical injury on someone with whom he had a dating relationship and (2) the injury he inflicted resulted in a traumatic condition. Nothing in CALCRIM No. 840 stated that a prior conviction of domestic violence obviated the need for the jury to find those two elements.

Finally, at no point did the prosecutor argue that Medina's prior convictions were sufficient by themselves to prove the charged crimes. Instead, the prosecutor argued the elements of attempted murder and corporal injury to a partner. The prosecutor then talked about CALCRIM No. 852A, referring to it as being "about *prior* domestic violence." (Italics added.) She then added, "This is a man who [has] had a long history of domestic violence based on three convictions that you heard about. And what the law tells you is that you can use those convictions, the evidence, that stipulation that the defendant is dispose[d] or inclined to commit domestic violence. And what does that mean, if you believe, and should, because, again, we stipulated to it, we agreed to it, if he's done it in the past, you can use that as evidence that he did it here, and I'm not saying just because you heard that, that's it, that's the reason you should vote guilty on this case; that's just another thing that supports

16

the fact that he's guilty, and that's exactly what this jury instruction tells you, if he's done something like that in the past, you can use that to say he did it here." These statements reaffirmed that CALCRIM No. 852A applied to the uncharged crimes, i.e., that his prior convictions were evidence he committed the current offenses but did not necessarily compel a conclusion "he did it here."

Medina, however, likens this case to *People v. Maurer* (1995) 32 Cal.App.4th 1121, where the court gave conflicting instructions on motive. On the substantive offense of child annoyance, the court instructed that the conduct had to be motivated by an unnatural or abnormal sexual interest in the victim. (*Id.* at p. 1125.) But a separate instruction stated that motive was not an element of the crime charged and need not be shown. (*Ibid.*) The appellate court found the conflicting instructions to be prejudicial error requiring reversal.

In contrast, this case does not involve two conflicting instructions. As we have said, the modified or added paragraph in CALCRIM No. 852A is a correct statement of law, i.e., a prior conviction can support a finding that Medina committed the current offenses but does not compel that conclusion. Thus, whereas the two instructions in *Maurer* could not be reconciled, CALCRIM No. 852A can be read in manner that is internally consistent. To the extent it could be read otherwise, such a reading would require the added paragraph to be read in isolation, ignoring not only the rest of CALCRIM No. 852A, but also the reasonable doubt instruction, the specific instruction on the elements of the offense of corporal injury to a partner, and the prosecutor's closing argument.

17

Although we conclude that, based on the instruction and the instructions and record as a whole, there is no reasonable likelihood the jury misapplied the law in violation of the Constitution (see generally *People v. Mitchell*, *supra*, 7 Cal.5th at p. 579), we also reject Medina's claim that the verdicts establish that any error was prejudicial.  The jury initially deadlocked on the two counts but ultimately acquitted Medina of count 1 for attempted murder and convicted him of count 2 for corporal injury to a partner.  Medina appears to assert that because the only contested issue was the identity of Emma's attacker, the most logical way to reconcile the verdicts is the jury believed it could convict him of count 2 based solely on his prior domestic violence convictions.  Medina thus suggests that the jury believed that the added paragraph in CALCRIM No. 852A required it to convict him of count 2 because he had prior convictions for domestic violence.

However, if the only contested issue was identity and the jury acquitted Medina on that basis of count 1, then the jury would have acquitted Medina of *both* counts:  if he was not the person who tried to kill her, he was also not the person who caused corporal injury to her.  Instead, the jury clearly rejected the identity defense and acquitted Medina of attempted murder on some other ground, such as whether there was evidence beyond a reasonable doubt he had the specific intent to kill Emma.  The verdicts can therefore be reconciled on a ground other than that the jury believed it had to find Medina guilty of count 2 because he had prior convictions for domestic violence.

We therefore do not agree that the verdicts show that any error was prejudicial.  And as we discuss in the next section, the evidence that Medina was the person who stabbed Emma was

18

overwhelming. Therefore, even if there was instructional error, it was not prejudicial under either *Chapman* or *Watson*.

## II. The motion for mistrial

Medina moved for a mistrial after Rukseta testified that Emma had told her Medina had threatened to kill Emma. The trial court denied the mistrial motion, and Medina contends that the trial court erred. We find no error.

### A. *Additional background*

The prosecutor asked Rukseta on direct examination why Medina was angry about Emma's friendship with a man named Joe. Rukseta answered, "I just know she had said something to me when they first started dating, that kind of stuck out; it was [a] red flag to me, and I tried to say that to her, that Emma told me, 'He told me if he ever caught me cheating he'd kill me.' 'Don't you think that's a red flag? You just started dating this guy. And I believe him.' "

Defense counsel objected to the testimony as hearsay and moved to strike it. The prosecutor responded that the statement was admissible because Emma's statement went to her and Medina's states of mind. Defense counsel objected that Emma's state of mind was not relevant. The trial court declined to strike the testimony, finding it relevant to Emma's state of mind. However, after the lunch break, the trial court told counsel it had reconsidered its ruling and would strike Rukseta's testimony because "at this point in the trial and with the defense of identity, [Emma's] state of mind is not relevant. It won't be admissible for hearsay purposes." Defense counsel moved for a mistrial, and the trial court denied the motion, stating it was not

19

"unduly prejudicial in light of the huge amount of violence that occurred in this case."

The trial court then instructed the jury to disregard Rukseta's testimony about Medina's alleged threat to kill Emma if she cheated on him and to "treat it as though that statement was never made in court."

B. *The trial court did not abuse its discretion*

A motion for mistrial is directed to the trial court's sound discretion. (*People v. Jenkins* (2000) 22 Cal.4th 900, 985–986.) " ' " 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' [Citation.] A motion for a mistrial should be granted when ' " 'a [defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' " ' " (*People v. Dalton* (2019) 7 Cal.5th 166, 240.)

Medina's mistrial motion was based on the jury hearing hearsay that violated Evidence Code section 1250. Under that section, a hearsay statement is admissible to prove the declarant's state of mind, emotion or physical sensation "at any other time when it is itself an issue in the action" or to prove or explain the declarant's acts or conduct. (Evid. Code, § 1250.) For example, a declarant's statement she feared the defendant may be admissible regarding whether she would have consented to let the defendant into her home where consent is at issue. However, a victim's out-of-court statement she feared the defendant is admissible under that section only when that fear is in dispute. (*People v. Jablonski* (2006) 37 Cal.4th 774, 819.) Where a

victim's state of mind is not relevant to any disputed issue, a victim's statement she feared the defendant is irrelevant. (*Id.* at p. 820.)

Emma's state of mind was not relevant to any issue in dispute. Rather, as the trial court found, the dispute at trial was her attacker's identity. On this ground, the trial court struck Rukseta's testimony that Emma told her Medina had threatened to kill Emma.

The trial court did not then abuse its discretion by denying Medina's mistrial motion because Rukseta's stricken testimony did not irretrievably damage Medina's chances of receiving a fair trial. Rather, the evidence that Medina stabbed Emma was overwhelming. Her neighbors and roommate testified that Emma and Medina had a tumultuous relationship, such that Emma's neighbor Jocelyn had previously considered calling the police. Rukseta said Medina threw glass bottles during arguments. And although Emma said that Medina had come over only once the day she was stabbed, Rukseta and Stephen, the next-door neighbor, said Medina was there at least once before, in the afternoon. Rukseta added that when Medina left in the afternoon, Emma told her that Medina was dead to her and implied that Rukseta should call the police if he returned. Later that evening, just before the wounded Emma stumbled into Rukseta's room, Rukseta heard Emma say, "*he's* back." (Italics added.) It was reasonable for the jury to infer that Medina was the "he" Emma was referring to, given that Medina had been there earlier that day. Emma then told Rukseta that this "fool," which is how she referred to Medina, stabbed her. Again, the jury could reasonably infer that Emma was identifying Medina as

21

her attacker. Emma also identified Medina as her attacker at trial.

The testimony of other witnesses and forensic evidence also suggested that Medina was Emma's attacker. The Fines saw Medina leave Emma's home around the time she was stabbed. Von Foerster saw the man she recognized as Emma's boyfriend get into a car that was parked where Emma's boyfriend usually parked. Rukseta, the Fines, the Bosches, and von Foerster all heard a car that sounded like Medina's Cadillac leave just after Emma was stabbed. Video surveillance supported a conclusion that Medina was at Emma's when she was stabbed. Also, Emma's blood was on Medina's sweater.

Although Medina denied stabbing Emma, he gave conflicting statements to detectives, saying both that he was with Emma that day but passed out on her bed *and* that he had tried to see her but Emma and Rukseta would not let him into the house. Moreover, Medina's initial statement that he was passed out in Emma's room until she woke him at 8:00 p.m. was not possible. Emma was stabbed at just past 6:00 p.m., paramedics arrived 19 minutes later, and they transported her to the hospital. Therefore, Emma could not have awakened Medina at 8:00 p.m. because she was incapacitated and at the hospital at that time.

Furthermore, Medina was not prohibited from presenting his defense. Through his eyewitness expert, he called into question, for example, whether the Fines improperly influenced each other's memories and whether Emma could have recovered her memory. Medina also introduced evidence through his audio/visual forensic expert that the car leaving Emma's that

22

evening was not Medina's Cadillac. Therefore, Medina was able to present evidence that he was not Emma's attacker.

Finally, the trial court admonished the jury to disregard Rukseta's testimony about Medina's alleged threat to kill Emma if she cheated on him and to "treat it as though that statement was never made in court." Such a curative admonishment helps cure any prejudice that might result from erroneously admitted evidence. (See, e.g., *People v. Wharton* (1991) 53 Cal.3d 522, 566.)

Medina, however, argues that the admonishment was both untimely and inadequate. Medina argues that the admonishment was untimely because Rukseta gave the challenged testimony perhaps around 11:00 a.m. The trial court recessed for 15 minutes to discuss the defense's objection, the jury returned at 11:36 a.m., and Rukseta resumed testifying until noon, when court recessed for lunch. When the jury returned from lunch at about 1:30 p.m., the trial court admonished the jury to disregard Rukseta's testimony about Medina's threat to kill Emma.

Based on this timeline, Medina asserts that the "threat evidence" was permitted "to stand for a significant amount of time" and the curative instruction was "substantially delayed," thereby "taint[ing]" Rukseta's additional testimony. We do not agree that the approximate several hour gap between when the jury heard Rutseka's testimony and the trial court struck it somehow prejudiced Medina. Rather, the majority of the time gap was due to the lunch break, after which the trial court immediately instructed the jury to disregard Rukseta's testimony. There was no substantial or undue delay in striking the testimony.

And contrary to Medina's assertion that the trial court's instruction was vague because it did not specify it pertained to Medina's threat, the instruction was unambiguous. The trial court said that "shortly before lunch today, Miss Rukseta testified about an alleged threat made to kill Emma if she ever was caught cheating. That entire answer to that question where that was based on, it was stricken. The jury is instructed to disregard it, treat it as though that statement was never made in court." The admonishment was clear as to what it concerned: Medina's threat to kill Emma. The defense did not then object to the admonishment, and no juror questioned it. We presume the jury followed that instruction. (*People v. Chhoun* (2021) 11 Cal.5th 1, 30.)

Finally, Medina makes the related argument that the denial of his mistrial motion violated his federal due process rights.[7] A deprivation of federal due process rights requires the defendant to satisfy a high constitutional standard to show that the error resulted in an unfair trial. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229.) " 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citation.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' (*Jammal v. Van de Kamp* [1991] 926 F.2d [918,] 920, italics omitted.) 'The dispositive issue is ... whether the trial court committed an error

---

[7] Because we address this issue on the merits, we need not address Medina's additional argument that his trial counsel failed to "federalize" his objection to Rukseta's testimony, thereby providing ineffective assistance of counsel.

which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." [Citation.]' (*Reiger v. Christensen* (9th Cir. 1986) 789 F.2d 1425, 1430.)" (*Id.* at pp. 229–230.)

We reject Medina's due process claim for the same reasons stated above. Specifically, the trial court struck Rukseta's testimony and told the jury to disregard it. Also, the stricken evidence was not of a quality to deprive Medina of a fair trial. Rather, the stricken testimony was that he threatened to kill Emma. The jury acquitted Medina of attempted murder, which suggests it either followed the trial court's instruction to disregard that testimony or nonetheless found that testimony insufficient to support an intent to kill. Also, although we do not dispute Medina's characterization that the threat showed he was "a dangerous individual," other evidence tended to show that Medina and Emma had an abusive relationship. That is, Rukseta said Medina and Emma argued, Medina had thrown glass bottles during the arguments, and the next-door neighbors could hear Medina's and Emma's arguments. And the day Emma was stabbed, she and Medina had a fight, after which Emma told Rukseta to do what she had to do—i.e., call the police if he returned. In short, other evidence showed that Medina was a danger to Emma.

III.    Sentencing

The trial court imposed the upper terms on count 2 and on the great bodily injury enhancement. Medina now contends the trial court erred because it used the same aggravating factor of great bodily injury to impose the upper terms.

25

A.  *Additional background*

At the bench trial, the trial court found true five aggravating circumstances or factors.  As to whether the crime involved great bodily injury or a high degree of cruelty, viciousness, or callousness, the trial court said that to it, "great bodily injury is really a matter of degree.  When you read the jury instruction of great bodily injury something that just requires a few stitches can be great bodily injury, it's slight, moderate harm is the word of [the] jury instruction.  But great bodily injury can range from that all the way up to and including someone with[in] a hair of losing their life, which is what happened here.  [¶]  All the medical testimony [showed] that the defendant came very close to killing Emma.  She had lost units and units of blood.  Was given more blood in transfusions th[a]n blood that is contained in the human body, according to the testimony, and the injuries inflicted were so severe that they affected her memory, her physical ability to function, even years later, and her mental ability years later.  [¶]  So with that in mind I think it is true the circumstance regarding cruelty, viciousness, and infliction of great bodily injury, even though the [section] 12022.7 allegation was found to be true."

Second, the trial court found that there was "no question" based on Emma's injuries and the testimony that Medina used a knife.  (Rule 4.421(a)(2).)

Third, the trial court cited Medina's "record of domestic violence going back to 2003 when he was [first] convicted in a misdemeanor case of [section] 273.5."  He then had theft cases and another conviction of section 273.5 in 2012.  Thus, the trial court found that Medina was a serious danger to society.  (Rule 4.421(b)(1).)

26

Fourth, the trial court found that Medina was on probation for violating section 273.5, subdivision (a), when he committed a weapons and ammunition offense. (Rule 4.421(b)(5).)

And fifth, Medina had served a prior prison term. (Rule 4.421(b)(3).)

Then, at the subsequent sentencing hearing, the trial court stated it was aware of recent changes in the law requiring aggravating circumstances to deviate from a middle or low term, per section 1170. The trial court noted that it had found five aggravating circumstances true, and "as I stated in the *Romero*[8] motion, none of those factors has to do with the fact that the defendant in this case has committed so many convictions of domestic violence in the past that he obviously has some hatred and willingness to do serious damage as he did in this case to women, women whom he has had a social or relationship with." So, "if you look at the five circumstances in aggravation, the two prior felony convictions for domestic violence, the misdemeanor convictions for domestic violence and there is no question in my mind that this case does call out for the high term, but the factors in aggravation far exceed any mitigation. [¶] In fact, there is no mitigation whatsoever th[at] I can see. And for the record, I'm imposing the high term. If any of the circumstances in aggravation that the court found to be true are considered improper, any one of those aggravating circumstances in my mind is sufficient to support the high base term." Accordingly, the trial court imposed the upper term of five years on count 2.

---

[8]     *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.
        The trial court had previously denied a motion to strike a prior strike conviction.

27

The trial court then said it was aware it had discretion to strike the great bodily injury enhancement, but "there is a graduation of great bodily injury, that great bodily injury could be any more than minor or moderate harm as defined by [ ] the jury instruction. [¶] But here, the injuries inflicted on Emma were so great, so severe that she was literally within an inch of being killed[,] has lasting [e]ffects of those injuries that she's confined to a wheelchair and these crimes occurred in September of 2021. [¶] So here we are how many years later, three and a half years later, and she is still confined to that wheelchair. So there is no question in my mind that is an aggravating circumstance. There is no mitigation as it relates to the great bodily injury allegation." The trial court imposed the upper term of five years for the great bodily injury enhancement.

### B. *Dual use of aggravating factor*

Section 1170, subdivision (b)(2), makes the middle term the presumptive term in the absence of aggravating circumstances that justify a term exceeding the middle term. A single aggravating circumstance is sufficient to impose an upper term. (*People v. Sperling* (2017) 12 Cal.App.5th 1094, 1103.) However, a court may not use a single aggravating factor both to impose the upper term for the crime and to impose the upper term for an enhancement. (*People v. Scott* (1994) 9 Cal.4th 331, 350.)

We generally review sentencing decisions for abuse of discretion. (*People v. Panozo* (2021) 59 Cal.App.5th 825, 837.) An abuse of discretion is found where the court " 'relies upon circumstances that are not relevant to the decision or that otherwise constitute an improper basis for decisions.' " (*Ibid.*) Also, we will find an abuse of discretion where a court acted unaware of the scope of its discretion. (*People v. McDavid* (2024)

15 Cal.5th 1015, 1023.) However, a "trial court's judgment is presumed to be correct and to be based on legitimate sentencing objectives. Isolated or ambiguous remarks by the trial court do not overcome that presumption. The party attacking the judgment must clearly and affirmatively demonstrate that the trial court relied on improper considerations." (*People v. Superior Court* (*Du*) (1992) 5 Cal.App.4th 822, 835.) Absent evidence to the contrary, we presume the trial court knew and applied the law in effect at the time of sentencing. (*People v. Ramirez*, *supra*, 10 Cal.5th at p. 1042.)

As an initial matter, an objection is required to preserve appellate review of a claim involving a trial court's failure to properly make discretionary sentencing choices, including imposing an upper term. (*People v. Scott*, *supra*, 9 Cal.4th at p. 353; *People v. Velasquez* (2007) 152 Cal.App.4th 1503, 1511). However, Medina's trial counsel did not object to his sentence. Although Medina's claims are therefore forfeited, we address them on the merits, as Medina alternatively argues that his counsel's failure to object constituted ineffective assistance of counsel.

Turning to the merits, it is first not clear that the trial court imposed the upper term on count 2 based on great bodily injury as the aggravating circumstance. Rather, when discussing why it was imposing the upper term on the substantive offense, the trial court referred to all "five circumstances in aggravation, [and] the two prior felony convictions for domestic violence, the misdemeanor convictions for domestic violence." Therefore, it is not clear which of the five aggravating factors the trial court relied on to impose the upper term on count 2, because the trial court referenced all of them. Indeed, by referencing Medina's

29

criminal history, it appeared to focus on the serious danger he posed to society and his criminal background.

Moreover, rule 4.421(a)(1) itself contains different factors or types of conduct, including great violence, great bodily harm, threat of great bodily harm "or other acts disclosing a high degree of cruelty, viciousness, or callousness." Any of the enumerated types of conduct satisfy the rule. (*People v. Duran* (1982) 130 Cal.App.3d 987, 990 [rule does not require great bodily harm; if it did, references to great violence and threat of great bodily harm would be "meaningless"]; *People v. Wilson* (1982) 135 Cal.App.3d 343, 357 [viciousness and callousness is separate from and not synonymous with great bodily harm], disapproved of on other grounds by *People v. Jones* (1988) 46 Cal.3d 585, 592, fn. 4.)

The trial court found true at least the great bodily injury portion of rule 4.421(a)(1) *and* that Medina's act disclosed a high degree of cruelty, viciousness, or callousness. The trial court observed that Emma had almost died, lost a lot of blood, and lost her memory and ability to walk as a result of her injuries. In imposing the upper term on count 2, the trial court thus could have relied on the cruelty, viciousness, and callousness of Medina's act. (See, e.g., *People v. Gutierrez* (1992) 10 Cal.App.4th 1729, 1735–1736 [error in using fact that crime involved great bodily injury to impose upper term, where term also imposed for great bodily injury enhancement, was harmless where defendant acted with cruelty, viciousness, and callousness].)

But even if the trial court did improperly use the same fact to impose the upper terms on count 2 and the enhancement, any error is subject to the harmless error test under *People v. Watson*, *supra*, 46 Cal.2d 818. Under *Watson*, a trial court's consideration of an impermissible sentencing factor is not prejudicial unless it

30

is reasonably probable a more favorable sentence would otherwise have been imposed in the error's absence. (*People v. Coleman* (1989) 48 Cal.3d 112, 166; *People v. Avalos* (1984) 37 Cal.3d 216, 233 [applying *Watson* to "improper dual use of facts"].)

Here, the trial court found true five aggravating factors. It made clear that if any one of them were found invalid, then any of the remaining factors would be sufficient to impose an upper term. Stated otherwise, the trial court was explicit that all of the aggravating factors warranted the upper terms in its view. (See, e.g., *People v. Osband* (1996) 13 Cal.4th 622, 728–729 [where court could have selected disparate facts from among those it recited to justify imposing both a consecutive sentence and upper term, record disclosed "no reasonable probability that it would not have done so"].)

Finally, we do not agree that the trial court was unaware of the scope of its discretion or, posed differently, thought it could use the same aggravating factor to impose the upper term on count 2 and on the enhancement. The record shows the opposite, that the trial court fully understood the scope of its discretion: it referenced the change in law requiring it to deviate from the low or middle terms only if aggravating factors outweighed mitigating ones, referred to all five aggravating factors to support its sentencing decision, and stated that if one factor was invalid, then it would rely on any of the remaining factors to aggravate the terms.

We therefore reject Medina's claim that the trial court erred in imposing the upper terms on count 2 and the enhancement.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

ADAMS, J.

HANASONO, J.